Kelvin WASHINGTON,
Plaintiff–Appellee,

v.

HCA HEALTH SERVICES OF TEXAS,
INC., doing business as HCA Spring
Branch Medical Center, Defendant–Appellant.

No. 97–20310.

United States Court of Appeals,
Fifth Circuit.

Sept. 3, 1998.

Joseph Y. Ahmad, Ahmad & Zavitsnaos, Houston, TX, for Plaintiff–Appellee.

Nancy Lynne Patterson, Littler Mendelson, Mark E. Edwards, Houston, TX, for Defendant–Appellant.

Barbara L. Sloan, Washington, DC, for Equal Employment Opportunity Commission, Amicus Curiae.

Before POLITZ, Chief Judge, and GARWOOD and BARKSDALE, Circuit Judges.

GARWOOD, Circuit Judge:

In this interlocutory appeal, we are asked to decide whether a court should consider the plaintiff's *medicated* or *unmedicated* condition to determine whether the plaintiff has a "disability" under the Americans with Disabilities Act (ADA).

### Facts and Proceedings Below

Plaintiff-appellee Kelvin Washington (Washington) brought a claim under the ADA against his former employer, defendant-appellant HCA Health Services of Texas, Inc. (the Hospital), alleging that he was discriminated against in violation of the ADA due to the fact that he suffers from Adult Stills Disease.

Washington began working for HCA Health Services of Texas, Inc. d/b/a the Spring Branch Medical Center, on September 26, 1991, as a senior accountant. Prior to this he was employed at another HCA facility from July 3, 1989, until September 1991. In July 1989, Washington was diagnosed with Adult Stills Disease, a degenerative rheumatoid condition affecting his bones and joints; as a result of this disease, he also suffers from Membranous Glomerulonephritis, a related kidney disease.

Washington is able to control the effects of this disease through medication. He regularly takes four prescription medications that control the pain and other symptoms associated with the disease. Thanks to this medication, he is able to lead a relatively normal life; without such treatment, Washington would be bedridden and unable to work.

In 1993 the demands of Washington's job increased and he often worked sixty to eighty hour weeks. In May 1993 Washington collapsed at work and his doctor recommended that he limit his work to ten hours per day and fifty hours per week. The doctor believed that this work restriction was necessary because Washington's disease activity had increased as a result of the twelve to sixteen hour days that he had been working.

Washington informed his supervisor about his doctor's advice and through a lawyer he requested that, as a person with a disability under the ADA, he be accommodated. Washington asserts that the requested accommodation was refused, but he nevertheless limited his work hours to fifty hours per week, in accordance with his doctor's advice. Shortly thereafter, the Hospital eliminated one of the two senior accountant positions during a work force reduction, and Washington was terminated. He filed this suit alleging that he was terminated in violation of the ADA.

The suit was initially filed on April 13, 1994, in Texas state court, but the Hospital filed a Notice of Removal and the case was subsequently removed to the United States District Court for the Southern District of Texas, Houston Division.

On March 17, 1995, the Hospital filed a motion for summary judgment claiming that it had a nondiscriminatory reason for terminating Washington's employment. The court granted the motion on May 18, 1995. In response, Washington filed a motion for new trial; the motion was denied, and Washington appealed. This Court reversed the summary judgment, finding a triable issue of fact regarding the Hospital's motive for laying off Washington, and remanded the case back to the district court. *See Washington v. HCA,* No. 95–20628, 95 F.3d 45 (5th Cir.1996) (unpublished).

On remand, the Hospital filed another motion for summary judgment, arguing that Washington was not "disabled" under the ADA since this disease was effectively controlled by medication. The court denied the motion, ruling that Washington's condition should be considered in its unmedicated state and as such constituted a disability under the ADA. The court, however, recognized that the question whether an individual must be assessed in his medicated or unmedicated state is a novel question in this Circuit and certified it for appeal to this Court pursuant to 28 U.S.C. § 1292(b).[1] Thus, the sole ques-

---

1. We agree with the district court that this is a novel question that has not been explicitly re-

tion before us is whether a court must assess an individual's condition with or without regard to mitigating measures, when determining whether that individual is "disabled" under the ADA.

## Discussion

### I. The ADA

█ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Thus, to establish a claim under the ADA, a plaintiff must demonstrate that:

(1) he is *disabled* within the meaning of the ADA;

(2) he is *qualified;* and

(3) the employer *discriminated* against him based on his alleged disability.

*See Rizzo v. Children's World Learning Centers, Inc.,* 84 F.3d 758, 762 (5th Cir.1996); *Daugherty v. City of El Paso,* 56 F.3d 695, 696 (5th Cir.1995). This appeal is concerned only with the first prong.

To satisfy the first prong of an ADA cause of action, a plaintiff must demonstrate that he is disabled by satisfying one of the prongs of the ADA's definition of disability. Under the ADA, a disability is defined as:

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

The only question before us is whether Washington satisfies subparagraph (A). Under subparagraph (A), a plaintiff must demonstrate that: (1) he has an *impairment, and* (2) that impairment *substantially limits* a major life activity.[2] The ADA does not specify whether the existence of an impairment or the determination of whether an impairment substantially limits a major life activity should be made with regard to medication or other mitigating measures. Because the text of the ADA is not unambiguously clear on this matter, we turn to other sources for guidance. The two main sources that guide our decision are the EEOC's Interpretive Guidelines and the legislative history of the ADA.[3]

### II. The Legislative History

The EEOC's interpretation is consistent with much of the legislative history of the ADA. The House Education and Labor Committee Report discusses the three-pronged definition of disability. With regard to the first prong ("a physical or mental impairment that substantially limits one or more of the major life activities of such individual," 42 U.S.C. § 12102(2)(A)) the Committee Report explains that:

"Whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids. For example, a person who is hard of hearing is substantially limited in the major life activity of hearing, even though the loss may be corrected through the use of a hearing aid. Likewise, persons with impairments, such as epilepsy or diabetes, which substantially limit a major life activity are covered under the first prong of the definition of disability, even if the effects of the impairment are controlled by medication." H.R. REP. No. 101–485(II) at 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 334.

---

solved by this Court or the Supreme Court. In a recent ADA case the Supreme Court noted the dispute over whether mitigating measures should be considered, but did not further explore the issue. *See Bragdon v. Abbott,* —— U.S. ——, ——, 118 S.Ct. 2196, 2206, 141 L.Ed.2d 540 (1998).

**2.** The terms "impairment" and "substantially limits" are not further defined by the ADA.

**3.** *Cf. Guilzon v. Commissioner,* 985 F.2d 819, 823–24 n. 11 (5th Cir.1993) (stating that, "Fifth Circuit law is crystal clear that when ... the language of a statute is unambiguous, this Court has no need to and will not defer to extrinsic aids or legislative history.").

The House Judiciary Committee Report uses similar language to describe the breadth and meaning of the first prong of the definition of disability:

"The impairment should be assessed without considering whether mitigating measures, such as auxiliary aids or reasonable accommodations, would result in a less-than-substantial limitation. For example, a person with epilepsy, an impairment which substantially limits a major life activity, is covered under this test, even if the effects of the impairment which substantially limits a major life activity, is also covered, even if the hearing loss is corrected by the use of a hearing aid." H.R. REP. No. 101–485(III) at 28, *reprinted in* 1990 U.S.C.C.A.N. 445, 451.

The Senate Labor and Human Resources Committee Report, however, is somewhat inconsistent with these two House Reports. Like the House Reports, the Senate Report states that "whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids." S. REP. No. 101–116, at 23 (1989). But, the Senate Report then goes on to describe the purpose of the third prong ("being regarded as having such an impairment" 42 U.S.C. § 12102(2)(C)):

"Another important goal of the third prong of the definition is to ensure that persons with *medical conditions that are under control,* and that therefore do not currently limit major life activities, are not discriminated against on the basis of their medical conditions. [Examples include:] individuals with *controlled diabetes or epilepsy* ... [or individuals who] wear *hearing aids* ...." S. REP. No. 101–116, at 24 (1989)(emphasis added).

The Senate Report is thus to some extent inconsistent with the House Reports in its treatment of individuals with controlled disabilities. While the House Reports indicate that individuals with epilepsy, diabetes, or hearing impairment should be assessed without regard to mitigating measures and therefore considered to be "disabled" under the first prong, the Senate Report suggests that these individuals ought to be assessed in

their medicated state and thus are not disabled because they are not substantially limited in a major life activity; the Senate Report does, however, then go on to state that these individuals may be compensated under the ADA if they are discriminated against because they are "regarded as" being disabled.

Because of this partial inconsistency, we must choose whether to give more significance to the Senate Report or to the House Reports. For several reasons, we will give more weight to the House Reports. First, the House Reports are express and directly on point. The House Reports explicitly state in their discussions of the first prong that under the first prong a disability must be considered without regard to mitigating measures; the Senate Report, on the other hand, does not address the "mitigating measures" issue under the first prong, and instead discusses this aspect of the first prong in its discussion of the third prong.

A second reason why we follow the House Reports is that they came after the Senate Report. Given that much of the structure and language of the House Reports was borrowed from the Senate Report, it seems that the House Committees were aware of how the Senate Report dealt with the mitigating measures issue and consciously changed the language of the Reports.

Finally, the Senate Bill that was ultimately passed was amended to contain much of the text of the House Bill, indicating that the House's understanding of the ADA controlled the bill that was passed.

The EEOC also seems to have given greater weight to the House Reports and followed their explicit language rather than the language of the Senate Report.

III. The EEOC Interpretive Guidelines

The EEOC has determined that under the ADA a plaintiff should be assessed in his *unmedicated* condition in order to determine whether he is disabled. In its *Interpretive Guidance On Title I of [the ADA]*, the EEOC has stated that the "existence of an impairment" must be determined "*without regard to mitigating measures* such as medi-

cines, or assistive or prosthetic devices." 29 C.F.R. Pt. 1630 App. § 1630.2(h)(emphasis added). Likewise, the "determination of whether an individual is substantially limited in a major life activity" must also be made *"without regard to mitigating measures* such as medicines, or assistive or prosthetic devices." 29 C.F.R. Pt. 1630 App. § 1630.2(j) (emphasis added).

In some cases, courts have refused to follow the EEOC and held that a person should be assessed in his medicated state. ·In a case concerning pilots who must wear eyeglasses in order to see clearly, the Tenth Circuit declined to follow the EEOC Guidelines and dismissed the pilots' ADA claim. The court held that the EEOC Guidelines are contrary to the plain language of the ADA, and that mitigating measures, such as eyeglasses, must be taken into account when determining whether an individual is disabled. *See Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 902 (10th Cir.1997) ("We hold that [section 1630.2(j) ] of the EEOC's Interpretive Guidance is in direct conflict with the plain language of the ADA. The determination of whether an individual's impairment substantially limits a major life activity should take into consideration mitigating or corrective measures utilized by the individual.").[4] The Sixth Circuit has also expressed an inclination to disregard the EEOC. *See Gilday v. Mecosta County,* 124 F.3d 760, 767–68 (6th Cir.1997) (Kennedy, J., concurring in part and dissenting in part) and (Guy, J., concurring in part and dissenting in part). In *Gilday,* the court was faced with the issue of whether a non-insulin dependant diabetic who took oral medication was disabled. Al-

though the court never reached a clear resolution of the matter, it suggested that mitigating measures ought to be considered.

 We are not unsympathetic to this reasoning. In fact, we think that these cases, which have held that mitigating measures must be taken into account, offer the most *reasonable* reading of the ADA.[5] However, we also recognize that we cannot simply ignore the legislative history and EEOC Guidelines that dictate the opposite result. Only if we determine that the statute was unambiguous on its face and the agency interpretation was contrary to the plain meaning of the statute, can we ignore the EEOC's interpretation. *See Public Employees Retirement System of Ohio v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of the statute itself. Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language."). Contrary to the Tenth Circuit's conclusion that the ADA is susceptible to a plain reading, *Sutton,* 130 F.3d at 902, we find the statute to be ambiguous, and thus we cannot ignore the EEOC's interpretation.

 Because the EEOC's Interpretive Guidelines are not only not promulgated pursuant to any delegated authority to define statutory terms or the like but are also not subject to the notice and comment procedure like regulations are, they are not entitled to the high degree of deference that is accorded to regulations under the *Chevron* doctrine,[6]

4. Several district courts have also held that mitigating measures should be considered. *See, e.g., Cline v. Fort Howard Corp.,* 963 F.Supp. 1075, 1081 n. 6 (E.D.Okla.1997); *Gaddy v. Four B Corp.,* 953 F.Supp. 331, 337 (D.Kan.1997); *Moore v. City of Overland Park,* 950 F.Supp. 1081, 1088 (D.Kan.1996); *Murphy v. United Parcel Serv., Inc.,* 946 F.Supp. 872, 881 (D.Kan. 1996); *Schluter v. Industrial Coils, Inc.,* 928 F.Supp. 1437, 1445 (W.D.Wis.1996); *Coghlan v. H.J. Heinz Co.,* 851 F.Supp. 808, 813 (N.D.Tex. 1994).

5. We have on at least one occasion expressed skepticism over whether Congress really intended that we consider an individual without regard to mitigating measures. *See Ellison v. Software*

*Spectrum, Inc.,* 85 F.3d 187, 191–92 n. 3 (5th Cir.1996) (stating in *dicta* that "had Congress intended that substantial limitation be determined without regard to mitigating measures, it would have provided for coverage under § 12102(2)(A) for impairments that have the *potential* to substantially limit a major life activity."). While we share the skepticism expressed in *Ellison,* we recognize that the issue was not before the *Ellison* court and hence it was not fully explored or resolved; the court's statements are mere *dicta* and are not binding in this case.

6. The *Chevron* doctrine dictates that a court must defer to an agency regulation if the agency's interpretation of an ambiguous statute flows naturally from a permissible construction of the

but the interpretations are given *some* deference. *See Batterton v. Francis*, 432 U.S. 416, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) ("[A] court is not required to give effect to an interpretive regulation. Varying degrees of deference are accorded to administrative interpretations ...."); *see also Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995)(holding that interpretive rules, which are not subject to the notice and comment procedure, are not accorded the weight that regulations are given). In *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), the Court recognized that agency interpretations are not controlling, but they do "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." [7]

■ The amount of deference that a court must give to agency interpretations depends on several factors. The factors include: "the circumstances of their promulgation, the consistency with which the agency has adhered to the position announced, the evident consideration which has gone into its formulation, and the nature of the agency's expertise." *Rowinsky v. Bryan Independent School District*, 80 F.3d 1006, 1014 n. 20 (5th Cir.1996); *see also Batterton*, 97 S.Ct. at 2405 n. 9 (1977).

Applying these factors to the current dispute, we find that: (1) the EEOC's Interpretive Guideline has been a part of its regulations since the regulations were promulgated;[8] (2) they have consistently interpreted "disability" to mean "without regard to mitigating measures"; (3) the legislative history supports the agency's interpretation; and, finally, (4) the EEOC has significant expertise and authority to interpret and promulgate regulations under the ADA. In light of this, we find that we must give more than minimal deference to the EEOC's Interpretive Guidelines.

## IV. Analysis

■ Although we think it is more reasonable to say that mitigating measures must be taken into account,[9] we recognize that our position is not so much more reasonable to warrant overruling the EEOC. Thus, we will follow the EEOC Guidelines and the legislative history, but we read them narrowly. There is nothing in the Interpretive Guidelines or the legislative history that suggests that *all* impairments must be considered in their unmitigated states and *no* mitigating measures may ever be taken into account.

■ We hold that only serious impairments and ailments that are analogous to those mentioned in the EEOC Guidelines and the legislative history—diabetes, epilepsy, and hearing impairments—will be considered in their unmitigated state. The impairments must be serious in common parlance, and they must require that the individual use mitigating measures on a frequent basis, that is, he must put on his prothesis every morning or take his medication with some continuing regularity. In order for us to ignore the mitigating measures, they must be continuous and recurring; if the mitigating mea-

---

statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**7.** *See also Bragdon v. Abbott*, —— U.S. ——, ——, 118 S.Ct. 2196, 2207, 141 L.Ed.2d 540 (1998) (citing this passage of *Skidmore*).

**8.** Both the 1992 and the current version of the EEOC Interpretive Guidelines state that the "existence of an impairment" and the "determination of whether an individual is substantially limited in a major life activity" must be determined "without regard to mitigating measures such as medicines, or assistive or prosthetic devices." *Compare* 29 C.F.R. Pt. 1630 App. § 1630.2(h) & (j)(1992) *with* 29 C.F.R. Pt. 1630 App. § 1630.2(h) & (j)(1996).

**9.** In a case decided under the Rehabilitation Act, 29 U.S.C. §§ 701–796, a closely related statute and precursor to the ADA, we suggested that an individual must be assessed in his mitigated state and held that an insulin-dependent diabetic and a person with impaired vision were not "handicapped" under the Rehabilitation Act. *See Chandler v. City of Dallas*, 2 F.3d 1385, 1390–91 (5th Cir.1993). Although the ADA's definition of "disability" is borrowed from the Rehabilitation Act's definition of "handicapped," *Chandler* does not control this case. A case decided under the Rehabilitation Act is not controlling over the legislative history and administrative guidelines of the ADA, which indicate that mitigating measures should not be taken into consideration.

sures amount to permanent corrections or ameliorations, then they may be taken into consideration.

◼ If an individual has a permanent correction or amelioration, such as an artificial joint or a pin or a transplanted organ, that individual must be evaluated in his mitigated state and cannot claim that he is disabled because he would be "substantially limited in a major life activity" if he had *not* had his hip joint replaced. *Cf. Ray v. Glidden Co.,* 85 F.3d 227 (5th Cir.1996) (evaluating a plaintiff with hip and shoulder replacements in his mitigated state).

◼ Whether an individual must be evaluated without regard to mitigating measures depends on both the nature of the impairment and the mitigating measures employed by the individual. Thus, these issues must be considered on a case by case basis to determine whether the individual disease and the accompanying mitigation fall within the scope of the EEOC Guidelines and the legislative history. Some conditions, such as diabetes, will clearly have to be considered *without* regard to mitigating measures; others, such as hip replacements, will have to be evaluated *with* regard to mitigating measures. But most cases will not be as clear and we leave these for another day. For example, a correctable vision impairment, may or may not be sufficiently similar to the ailments enumerated in the EEOC Guidelines and legislative history, and as such we cannot say whether mitigating measures such as eyeglasses or laser surgery should be considered in assessing whether an individual is disabled.

◼ Based on the summary judgment evidence, we hold that Washington's Adult Stills Disease is sufficiently analogous to the ailments contemplated in the legislative history and the EEOC Interpretive Guidelines; his disease, like diabetes or epilepsy, is serious and requires that he take medication every day. Because Adult Stills Disease falls within the EEOC Interpretive Guidelines and the legislative history, mitigating measures should not be taken into account when assessing whether Washington is "disabled" under the ADA.

To a limited extent, we are joining the other circuits that have followed the EEOC Guidelines and held that a disability must be assessed without regard to mitigating measures. *See Arnold v. United Parcel Svc.,* 136 F.3d 854 (1st Cir.1998); *Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933 (3d Cir.1997); *Doane v. City of Omaha,* 115 F.3d 624, 627–28 (8th Cir.1997); *Harris v. H & W Contracting Co.,* 102 F.3d 516, 520–21 (11th Cir.1996); *Holihan v. Lucky Stores, Inc.,* 87 F.3d 362, 366 (9th Cir.1996); *Roth v. Lutheran General Hosp.,* 57 F.3d 1446, 1454 (7th Cir.1995).[10] But unlike these cases, we are not making a broad pronouncement that all impairments must be considered in their unmitigated state. Our holding is more limited; whether mitigating measures should be taken into account must be determined on a case by case basis under the general approach outlined above.[11]

### Conclusion

For the foregoing reasons, we affirm the district court's resolution of this matter. Washington should be evaluated in his unmedicated state.

AFFIRMED.

---

**10.** Several district courts have also held that mitigating measures should not be considered. *See, e.g., Fallacaro v. Richardson,* 965 F.Supp. 87, 93 (D.D.C.1997); *Wilson v. Pennsylvania State Police Dep't,* 964 F.Supp. 898, 902–907 (E.D.Pa.1997); *Sarsycki v. United Parcel Service.,* 862 F.Supp. 336, 340 (W.D.Okla.1994).

**11.** Judge Guy seems to have taken a somewhat similar approach in *Gilday,* 124 F.3d at 768.